# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

YVONNE R. PRATHER,                     )
                                       )
      Plaintiff,                  )
                                       )
v.                                     )          **Case No. 3:05-cv-1068**
                                       )          **Judge Trauger**
AUSTIN PEAY STATE UNIVERSITY,          )
                                       )
      Defendant.                  )


## MEMORANDUM

Pending before the court is the Motion for Summary Judgment (Docket No. 30) filed by

the defendant, Austin Peay State University, as well as the defendant's Motion to Amend the

Answer (Docket No. 62).  For the reasons discussed herein, the defendant's Motion for Summary

Judgment will be granted, and its Motion to Amend the Answer will be denied as moot.

## FACTUAL BACKGROUND

Plaintiff Yvonne R. Prather, an African-American woman, was hired by defendant Austin

Peay State University ("APSU") in its Department of Speech Communication and Theatre in

1989.[1]  In that role, the plaintiff was responsible for teaching a variety of courses relating to mass

---

[1]Unless otherwise noted, the facts are drawn from the parties' summary judgment briefs
(Docket Nos. 46, 57, 77, and 83) and related affidavits and exhibits, as well as from Plaintiff's
Response to Defendant's Amended Statement of Undisputed Facts (Docket No. 58), Defendant's
Response to Plaintiff's Additional Statement of Undisputed Facts (Docket No. 71), and
Plaintiff's Response to Defendant's Second Statement of Undisputed Facts (Docket No. 84).
Although facts are drawn from submissions made by both parties, on a motion for summary
judgment, all inferences are drawn in the light most favorable to the non-moving party.  *See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011
Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

communication and, at certain times, oversaw a student-produced television show called *AP Magazine*. She received tenure in 2000.

In early 2001, the plaintiff held the title Assistant Professor and Director of Television Studies, and she applied for a promotion to Associate Professor.[2] On March 2, 2001 the departmental promotion committee (the "Committee") declined to recommend the plaintiff for a promotion. The Committee denied her application because the plaintiff had not effectively used time she had been "reassigned" to work on *AP Magazine*, and it made specific recommendations of how she might meet the department's promotion requirements in the future. Additionally, under the heading "Scholarly and Creative Achievements," the Committee noted the "good quality" of the plaintiff's creative achievements but stated that, "[i]f creative work is to be substituted for scholarly publications, then the department expects more than one finished video for promotion to associate professor."

Also in 2001, the plaintiff attended a conference with several students. She had been informed by Michael Gotcher, the department chairman, that she would be reimbursed for her travel to the conference, but her reimbursement application was denied subsequently because, as the plaintiff acknowledges, she had failed to complete the appropriate forms. That same year,

---

[2]To obtain a promotion at APSU, a professor must prepare a "dossier" of application materials. The dossier is reviewed first by the professor's academic department, and members of the department faculty vote to recommend for or against promotion. If the dossier is approved by the relevant department, it proceeds to the college level. There, the dossier is reviewed by members of the college faculty, who vote to recommend for or against promotion. If the dossier is approved at the college level, it proceeds to the University Provost. If approved by the Provost, the dossier proceeds to the University President, and finally, if approved by the President, it proceeds to the Tennessee Board of Regents. If a professor's dossier is not recommended for promotion at any stage of the process, she has the right to appeal the negative recommendation to the next level.

Gotcher informed the plaintiff that she would be made the head of a search committee to fill an open position within the department, but she was never made the head of that committee.

Later in 2001, the plaintiff was informed by a colleague, David Von Palko, that she would no longer serve as the Director of Television Studies.  She was then informed that she would serve instead as the Executive Director of *AP Magazine*, a role she had held previously as a graduate student.  She asked Von Palko why he, and not Gotcher, was informing her of this change, and Von Palko responded, "Mike is out of town and I was asked to call you, and I hear that you've been going around campus raising hell."

Thereafter, the nameplate on the plaintiff's office door was changed, without her prior knowledge, from "Yvonne R. Prather, Director of Television Studies" to "Yvonne R. Prather, Executive Director of *AP Magazine*."  The plaintiff complained to Gotcher that this constituted a "demotion," although she still held the title of Assistant Professor.[3]

In late 2002, the plaintiff again applied for a promotion to the rank of Associate Professor.  On December 27, 2002,[4] the Committee again declined to support her application, noting that she had exerted "only the necessary minimum of effort" with respect to *AP Magazine*.  The Committee stated that "there [was] little to be found" in the plaintiff's dossier in terms of actual recent scholarly and creative achievements and noted that her dossier listed a number of works that were "in progress" or "in completion."  The Committee suggested that the

---

[3]According to the defendant, the change in the plaintiff's title simply reflected a "reorganization," and the change to her nameplate was standard procedure in light of the change in her title.

[4]The record is unclear whether this event took place in 2002 or late 2001.  The assumption will be made that it occurred in 2002, the date on which the plaintiff alleges it occurred, and the date that appears on a Committee document regarding the application.

3

plaintiff could improve her chances of promotion if she completed some of those works in progress.

The plaintiff alleges that a number of other harassing incidents took place during this time frame, although she does not provide specific dates or instances for many of these events. She complains that she was "singled out for absenteeism" in that she received absentee forms to fill out on days she was absent, although she does not contest that professors were expected to fill out such forms in the event of an absence. She further complains that she was "prohibited from giving Final Examinations early," but does not contest that university policy prohibited professors from giving examinations early as a general rule. She complains that she and her students were not permitted to use department facilities for social events, but provides no evidence that others were permitted to do so. Finally, she contends that she was ostracized at department meetings and not made the head of any committees, although she does not provide any details about the context or time frame of such events.

Additionally, the plaintiff complains that she was disparaged in front of her students by Von Palko and Gotcher, although she provides precious few details as to the timing and content of these allegedly disparaging statements, other than to say that she was "constantly denigrated . . . in the presence of her students for equipment that was allegedly moved, touched or changed with regard to the television cable programs."

In 2003, the plaintiff endeavored again to apply for a promotion to Associate Professor. Her application, however, was rejected as untimely. According to the plaintiff, a white male professor seeking tenure around the same time was permitted to make changes to his dossier after the deadline. Also in 2003, a noose was hung in a tree near a building on campus where a

4

NAACP meeting was taking place and near a building housing the office of another professor who had made allegations of racial discrimination. As a result of this incident, the Department of Education conducted an investigation and concluded that, though a "racially hostile environment" existed at APSU, the university had handled the situation appropriately.

In late 2003 or early 2004, the plaintiff was permitted to resign from her role with *AP Magazine*. Shortly thereafter, on January 14, 2004, the Committee once again did not recommend the plaintiff for a promotion to Associate Professor. The Committee found that the quality of the plaintiff's work on *AP Magazine* had decreased prior to her resignation from that position and that the plaintiff provided "negligible evidence" of improvement with respect to her scholarly and creative achievements, noting that her entire recent creative output consisted of three works that were "in progress." On February 10, 2004, the College Committee on Promotion denied the plaintiff's appeal, but noted her "apparent alienation" from other faculty in her department and recommended that the department chair and faculty meet with the plaintiff to develop a "proactive plan to support ongoing academic success."

According to the plaintiff, no such meetings ever took place. Additionally, the plaintiff contends that the benchmarks that the Committee set for her with respect to *AP Magazine* were impossible to attain because she was not provided with adequate funding, tools, and technical support for that task. She alleges that her white male colleagues in the radio department, by contrast, did receive adequate funding and other support from the department. Additionally, she claims that other faculty members who listed "works in progress" on their resumes were promoted during the same time frame.

On March 31, 2004, the plaintiff requested a meeting with Richard Jackson, APSU's Senior Advisor to the President for Diversity, Affirmative Action and Legal Affairs, to discuss "discrimination in the promotion process and the working environment within her department." The plaintiff provides few details of that meeting other than to assert that Mr. Jackson provided "no assistance whatsoever."

According to Mr. Jackson, during the meeting he reviewed the plaintiff's dossier but informed her that he could not evaluate it without comparing it to those of similarly situated faculty members who had been promoted. Mr. Jackson also informed the plaintiff that she had the right to review the dossiers of other faculty members to attempt to identify a similarly situated faculty member who had been promoted. Though Mr. Jackson asserts that he discussed with the plaintiff the process for filing a complaint pursuant to APSU's discrimination policy, she left the meeting without ever indicating that she wished to file a complaint.

In an email dated April 5, 2004, the plaintiff informed Mr. Jackson that she felt "uncomfortable" reviewing the dossiers of other faculty members, and asked if this was her "only recourse." Mr. Jackson responded that such "objective, quantifiable information," rather than "anecdotal beliefs," was the best way to demonstrate that the plaintiff had been treated differently from others similarly situated. The plaintiff had no further communications with Mr. Jackson following this email and never filed a formal complaint.

On May 6, 2004, the plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that she had been wrongfully denied promotions on account of her race and sex, that the defendant had not addressed her complaints about discrimination in the promotion process, and that she had been subjected to retaliation and a hostile work

6

environment.          In 2005, the plaintiff once again applied for a promotion to Associate Professor.  The Committee did not support her application, in part because the plaintiff had taken a leave of absence since her previous application, and therefore the Committee did not have sufficient information on which to base a decision.  By letter dated March 1, 2006, the plaintiff attempted to appeal this denial.  According to the defendant, however, the letter was not received until March 6, 2006, three days after the deadline for appeal, and was thus rejected as untimely.

In 2006, the plaintiff applied for a promotion to Associate Professor.  Though the Committee noted that the plaintiff's dossier was stronger than it had been in previous years, it once again rejected her application and noted again that her dossier included reference to a number of academic projects "in progress."

In 2007, the plaintiff taught an on-line course for APSU.  She claims that, after completing the course and posting grades for students, she was not paid for teaching the course.  Also in 2007, the plaintiff applied for a promotion to Associate Professor.  The Committee, the College Committee on Promotion, and the Provost all approved the plaintiff's application for promotion, and the University President recommended the plaintiff's application for promotion to the Tennessee Board of Regents.  Thereafter, the President discovered that a video produced by the plaintiff and submitted in support of her application contained significant flaws, but, as she had already submitted her recommendation to the Board of Regents, the President did not rescind her recommendation.[5]  The Board of Regents has since approved the application.

_____

[5]The plaintiff alleges that the University President "attempted" to revoke her recommendation but provides no further details.  Regardless, the plaintiff does not dispute that she was promoted to Associate Professor in 2007.

<u>**ANALYSIS**</u>

The plaintiff claims that she was subjected to discrimination on the basis of her race and sex, a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983.[6]  The defendant has moved for summary judgment on these claims.[7]

## I.      Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a

_____

[6]As a plaintiff must prove the same elements to recover on claims brought under Section 1983 and Title VII, the subsequent Title VII analysis applies equally to plaintiff's Section 1983 claims.  *See Lautermilch v. Findlay City Schs.*, 314 F.3d 271, 275 (6th Cir. 2003).

[7]The plaintiff additionally brought claims under the Tennessee Human Rights Act, 4-21-101 *et seq.*, and under Tennessee common law for negligent infliction of emotional distress and outrageous conduct.  (Docket No. 1 ¶¶ 1, 9.)  Those claims were dismissed previously by this court on Eleventh Amendment grounds.  (Docket No. 17.)

genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Race and Sex Discrimination Claims

As a preliminary matter, the plaintiff concedes that her claims relating to the defendant's failures to promote her in 2001 and 2002 are time-barred, because she did not file a charge with the EEOC within three hundred days of those events. (Docket No. 56 at 16.) Her claims relating to the 2004, 2005, and 2006 failures to promote, in addition to her hostile work environment and

retaliation claims, remain. Moreover, the Sixth Circuit has stated that, though discriminatory acts outside the limitations period—such as the 2001 and 2002 failures to promote—are not actionable, they may be considered "background evidence in support of a timely claim." *Bacon v. Honda of Am. Mfg.*, 192 Fed. Appx. 337, 342 (6th Cir. 2006) (quotation and citation omitted).

To prevail on her claims, the plaintiff may present either direct evidence of discrimination or circumstantial evidence creating an inference of discrimination. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). If the plaintiff presents circumstantial evidence, she must establish a *prima facie* case of discrimination under the framework established in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792, 802 (1973). If the plaintiff carries that burden, the defendant must present a legitimate, non-discriminatory reason for its actions. *Id.* at 802-03. If the defendant does so, the plaintiff must show that any such reason proffered by the defendant is merely a pretext for discrimination. *Id.* at 804.         A.         *Direct evidence of discrimination*

Direct evidence of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn*, 176 F.3d at 926. Such direct evidence may include, for example, "a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Isolated statements by a third party having no role in the decision-making process generally are insufficient to establish direct evidence of discrimination. *See, e.g.*, *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003) ("[C]omments made by individuals who are not

10

involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination.").

The sole incident that the plaintiff proffers as direct evidence of discrimination was the 2003 incident in which a noose was hung from a tree on campus. (Docket No. 57 at 19.) The plaintiff does not claim that the noose was placed by an individual having a role in the decision-making process, that the incident demonstrates the motivations of any of the decision-makers, or indeed that it was related in any way to the defendant's decisions regarding the plaintiff's employment. A racially offensive symbol that appears on campus because of the actions of a third party cannot possibly be read to demonstrate the motivations of the decision-makers involved here. Thus the plaintiff has not established direct evidence of discrimination under Title VII.

B.      *Circumstantial evidence of discrimination*

Where a plaintiff does not provide direct evidence of discrimination, she may instead adduce circumstantial evidence of discrimination by demonstrating that (1) she is a member of a protected class, (2) she applied for and was qualified for a promotion, (3) she was considered for and denied the promotion, and (4) other similarly-qualified employees who were not members of the protected class were promoted in the same time frame. *See Brewer v. Cedar Lake Lodge, Inc.*, No. 06-6327, 2007 U.S. App. LEXIS 18498, at *17 (6th Cir. Jul. 30, 2007) (citing *Nguyen,* 229 F.3d at 562-63, and applying modified version of the *McDonnell Douglas* standard in context of failure-to-promote claim); *McDonnell Douglas*, 411 U.S. at 802.

The plaintiff has satisfied the first three prongs of this test, as she is African-American and female, she applied for promotions in 2004, 2005, and 2006, and her promotion applications

11

were denied by the defendant each time. (Docket No. 57 at 20-21.) As to her qualifications, the plaintiff has established that she holds a Ph.D. in the relevant field and has worked and taught in the field for nearly twenty years. (Docket No. 57 Ex. A.) Indeed, it is uncontested that the plaintiff possessed the minimum criteria for promotion, and the fact that she was promoted to Associate Professor in 2007 bears out this conclusion. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003) (noting that plaintiff satisfies burden of proving qualification by presenting evidence that her qualifications are "at least equivalent to the minimum objective criteria required for employment . . . such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills").

To demonstrate that a similarly situated individual was promoted during the same time frame in which she was denied a promotion, the plaintiff need not demonstrate an "exact correlation" with others who were promoted, but she must demonstrate that others were similarly situated in "all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quotation and citation omitted). Differences in experience, job performance, and responsibilities may be relevant in determining whether two individuals are similarly situated. *See, e.g.*, *Leadbetter v. Gilley*, 385 F.3d 683, 691-92 (6th Cir. 2004) (holding that individuals were not similarly situated where they displayed differences in "academic achievement, experience, and work record").

With respect to the denial of her promotion application in 2004, the plaintiff claims that John Moseley and Frank Parcells, both white men who were granted tenure that year, are

12

similarly situated to her.[8]  (Docket No. 57 at 4.)  With respect to her 2006 application, the

plaintiff asserts that Leni Dyer, a white woman, was granted tenure and promoted that year.  It is

uncontested, however, that the tenure process was distinct from the promotion process, entailing

different processes and different requirements, and that neither Moseley nor Parcells sought a

promotion in 2004.  As neither Moseley nor Parcells sought or were considered for a promotion

at the same time that the plaintiff was denied a promotion, neither is comparable to the plaintiff

for the purpose of this analysis.   Additionally, the plaintiff has provided virtually no evidence

about the backgrounds, work experiences, or qualifications of either Parcells or Dyer, and thus

has not established that either of those individuals is similarly situated to her.

The plaintiff asserts that Weiwu Zhang, a man of Asian descent, was similarly situated to

her and was promoted in 2005.  (Docket No. 57 at 4.)  A cursory glance at Zhang's curriculum

vitae demonstrates that in the years immediately preceding his 2005 promotion, Zhang presented

a number of papers at academic conferences and submitted and published several articles in

scholarly journals.[9]  (Docket No. 57 Ex. K.)  By contrast, the plaintiff's curriculum vitae lists

only one paper presentation, one publication, and one creative display completed in the years

immediately preceding her 2005 promotion application.  (Docket No. 57 Ex. A.)  The plaintiff's

---

[8]The plaintiff claims that a number of faculty members who were promoted or tenured
between 2001 and 2006 were similarly situated to her.  We will focus, however, on those
purported comparables who were promoted or tenured during each of the years that the plaintiff
alleges she was unlawfully denied a promotion.

[9]The plaintiff makes much over the fact that Zhang's curriculum vitae lists "works in
progress" and newspaper articles and claims that she was treated less favorably than Zhang, in
that she was criticized for including such works in her curriculum vitae.  While she is correct that
Zhang's curriculum vitae does contain reference to works in progress and newspaper articles, she
ignores the fact that it also contains numerous completed academic projects, whereas her
curriculum vitae does not.

13

claim that Zhang was similarly situated to her is tenuous at best, but even if she establishes this fourth and final element of her *prima facie* case, her claim still fails because the defendant has provided a legitimate non-discriminatory reason for its decision not to promote the plaintiff in 2005.

According to the defendant, the plaintiff's 2005 application was denied because she had taken a leave of absence during the previous semester, and there was no change in the strength of her dossier after she had been denied a promotion in 2004.[10] (Docket No. 46 at 7.) To establish that this articulated non-discriminatory reason for denying her promotion application was in fact pretextual, the plaintiff must show that the reason either (1) has no basis in fact, (2) did not actually motivate the defendant, or (3) is insufficient to explain the defendant's actions. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). "Mere conjecture" that a defendant's proffered reason is pretextual is insufficient to overcome a motion for summary judgment. *Brennan v. Tractor Supply Co.*, No. 05-6487, 2007 U.S. App. LEXIS 10720, at *29 (6th Cir. May 2, 2007) (quotation and citation omitted).

The plaintiff does not contest the factual basis for the defendant's decision not to promote her in 2005, and she does not allege that the defendant's 2005 decision was not actually motivated by the concerns about her scholarship and teaching that the Committee had expressed when it previously denied her promotion applications. The plaintiff has offered no evidence other than her own personal belief that the reasons for the defendant's decision were not

---

[10]The plaintiff's 2004 application had been denied because, among other things, she provided "no evidence" of scholarly publication other than three creative works that were "in progress," was "frequently absent or unavailable without explanation," and had produced fewer and shorter episodes of *AP Magazine* than in years previous. (Docket No. 41 Ex. F.)

14

credible. Finally, the fact that the plaintiff had been denied promotions repeatedly on the basis of the same shortcomings supports the conclusion that the defendant's articulated reason for denying her a promotion in 2005 was both valid and sufficiently motivating.

As the plaintiff has not established the elements of a *prima facie* case of discrimination with respect to her 2004 and 2006 claims, and as she has failed to show that the legitimate non-discriminatory reason offered by the defendant for its 2005 failure to promote her was pretextual, summary judgment for the defendant is appropriate on these claims.

## III.    Hostile Work Environment Claim

The plaintiff also alleges that she was subjected to a discriminatory hostile work environment. (Docket No. 57 at 27-29.) To establish this claim, the plaintiff must demonstrate that (1) she was a member of a protected class, (2) she was subject to unwelcome harassment, (3) the harassment was based on her race or sex, (4) the harassment created a hostile work environment, and (5) her employer is vicariously liable for the actions of its employees. *See Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999). A hostile work environment exists only where the workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993). This standard is both subjective and objective, in that the plaintiff must show not only that she perceived the environment to be hostile or abusive, but also that the conduct was severe or pervasive enough that a reasonable person would consider it as such. *Id.* at 21-22. In determining whether a hostile work environment exists, courts look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or

15

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

The plaintiff here points to a litany of incidents and claims that those incidents, taken together, demonstrate the existence of a hostile work environment. Specifically, she alleges that she was disparaged in front of students by the department chairman and by a colleague, that she was not provided with adequate financial support, technical support, or mentoring, particularly in light of the benchmarks that the Committee set for her promotion, that she was removed as the Director of Television Studies, that she was singled out for absenteeism, that she was prohibited from giving final examinations early, that she was ostracized at department meetings, that she was never made the head of any committees, that she and her students were prevented from using certain facilities, that she was prevented from applying for a promotion in 2003, and that she was not reimbursed for her travel to a conference. (Docket No. 57 at 27-29.) She also claims that Von Palko accused her of "going around campus raising hell" when he informed her that she had been removed as the Director of Television Studies. (*Id.* at 28.) Finally, she claims that the 2003 noose incident is demonstrative of a hostile work environment. (*Id.*)

It is clear that, as a subjective matter, the plaintiff perceived the existence of a hostile work environment. The question remains whether the incidents of which she complains were sufficiently severe or pervasive that a reasonable person would consider the environment hostile or abusive. Generally, successful hostile work environment claims are predicated on incidents that are physically or verbally abusive, threatening, or humiliating. *See, e.g.*, *Jordan v. City of Cleveland*, 464 F.3d 584, 598 (6th Cir. 2006) (hostile work environment claim survived summary judgment where plaintiff alleged that he was subject to racial slurs, demeaning jokes,

16

inflammatory graffiti, isolation and segregation, and disparate discipline). The incidents involved here simply do not rise to that level. Given the totality of the circumstances, the plaintiff has not established that she was subject to a hostile work environment, and thus summary judgment is appropriate on this claim.

Moreover, though incidents that are not based explicitly on race or sex may be considered in evaluating a hostile work environment claim, *see Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 605 (6th Cir. 2002), *abrogated on other grounds by White v. Columbus Metro. Housing Auth.*, 429 F.3d 232, 240-41 (6th Cir. 2005), the plaintiff has not demonstrated that the treatment she complains of was motivated by her race or sex, or that she would not have been subject to such treatment but for her race or sex. Although she makes the bare assertion that non-protected colleagues were not criticized for absenteeism, prohibited from giving examinations early, or prevented from using certain facilities, and were provided with financial and technical support, she provides no evidence of any of this other than her own assertions and inadmissible hearsay. *See Jacklyn*, 176 F.3d at 927 ("Hearsay evidence may not be considered on summary judgment.").

In many instances, the plaintiff claims that she was treated differently, but she does not contest that she was treated consistently with department or university policies regarding, for example, reimbursements, absences, deadlines, and exam schedules. Again, she provides no evidence other than her own assertions and hearsay that those policies were applied more leniently to others. The allegedly disparaging comments that she complains of had to do with the maintenance of the department's facilities and equipment and were completely unrelated to race or sex. Moreover, there is no evidence that others were not subject to criticisms of the same

17

nature.  The plaintiff also complains about her removal as the Director of Television Studies, but she provides no evidence that this change was motivated by anything other than her performance in that role and the needs of the department.  To the extent that the plaintiff may have been ostracized or alienated from the department, there is no evidence that this was the result of anything but a personality conflict unrelated to race or sex.  Finally, though the plaintiff complains that she was not provided with financial or technical support (unlike her white male colleagues in the radio department) at her deposition she could not recall a single item or piece of equipment that she required but was not provided with by the department.  (Docket No. 77 at 24.)    The only two incidents cited by the plaintiff that might be tied to race are Von Palko's statement that the plaintiff was "going around campus raising hell" and the 2003 noose incident.  The plaintiff's own deposition testimony, however, demonstrates that Von Palko's statement had nothing to do with race, but merely referred to the fact that the plaintiff had complained about not being reimbursed for her travel to a conference.  (Docket No. 77 at 22.)  Further, there is no indication that the statement was related to the plaintiff's complaints about the promotion process, her promotion applications, or the decision to remove her as the Director of Television Studies.  Additionally, though the noose incident is indeed relevant in analyzing the plaintiff's hostile work environment claim, in the absence of other evidence of a racially hostile work environment, that incident alone is insufficient to save the plaintiff's claim.

**IV.    Retaliation Claims**

The plaintiff claims that the defendant retaliated against her for complaining about the promotion process to Richard Jackson, a senior administrator at APSU responsible for fielding discrimination complaints, and for filing her May 6, 2004 charge with the EEOC.  Specifically,

18

she alleges that the 2005 and 2006 failures to promote, the fact that her appeal of the 2005 decision was deemed untimely, events in 2007 relating to her promotion and her teaching of an on-line class, and the harassment she alleges, were all retaliatory.

To establish a retaliation claim, the plaintiff must demonstrate that (1) she engaged in activity protected by Title VII, (2) the defendant knew she had engaged in this activity, (3) she was subject to an adverse employment action or retaliatory harassment by a supervisor, and (4) there is a causal connection between the adverse employment action or retaliatory harassment and the plaintiff's protected activity. *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000). If the plaintiff succeeds in establishing a *prima facie* case of retaliation, the burden then shifts to the defendant to establish a legitimate, non-discriminatory reason for the adverse action. *Id.* at 792-93. If the defendant meets that burden in turn, the plaintiff then must demonstrate that the reason proffered by the defendant merely was a pretext for discrimination. *Id.* at 793. The standard for establishing pretext is the same in the retaliation context as in the discrimination context; the plaintiff must show that the proffered reason had no basis in fact, did not actually motivate the conduct, or was insufficient to warrant the conduct. *See Campbell v. Univ. of Akron*, 211 Fed. Appx. 333, 351-52 (6th Cir. 2006) (citing *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 564 (6th Cir. 2004), and noting that the standard *McDonnell Douglas* burden-shifting framework applies once a plaintiff has established a *prima facie* case of retaliation).

First, the plaintiff alleges that the defendant's 2005 and 2006 failures to promote her were retaliatory. (Docket No. 57 at 30-31.) Notably, however, the plaintiff's promotion requests were rejected repeatedly over several years, both prior to and following her complaints to

19

Jackson and the EEOC. Indeed, many of the reasons articulated by the defendant for rejecting the plaintiff's promotion applications following her 2004 complaints are nearly identical to the reasons it articulated for rejecting the promotion applications prior to her complaints. As there is no evidence that the plaintiff was treated any differently prior to and following her complaints, the plaintiff has failed to establish causation under the fourth prong of the standard. *See Walcott v. City of Cleveland*, 123 Fed. Appx. 171, 178 (6th Cir. 2005) (holding that plaintiff had not demonstrated causation when she was denied a promotion both prior to and following her filing of an EEOC complaint).

Second, the plaintiff complains that the Committee retaliated against her when it refused to accept her appeal of its 2005 decision to deny her promotion. Given the relative temporal proximity between this decision and the plaintiff's 2004 complaints, we will assume *arguendo* that the plaintiff has established a *prima facie* case with respect to this claim. The defendant, however, asserts that the plaintiff's appeal was rejected for a legitimate non-discriminatory reason—simply because it was not timely. (Docket No. 46 at 7.) The plaintiff does not contest that a letter from her attorney appealing the decision did not arrive prior to the deadline, that the letter's untimeliness did not actually motivate the decision, or that its untimeliness was an insufficient basis for rejecting the appeal.[11] Thus, she has not demonstrated that the non-discriminatory reason proffered by the defendant is pretextual.

_____

[11]The plaintiff argues that a letter from her attorney notifying the defendant of her appeal was sent several days prior to the deadline and that it "should have" arrived in time. She does not, however, claim that her appeal actually arrived by the deadline, nor does she challenge the veracity of the defendant's assertion that the letter did not arrive by the deadline.

Third, the plaintiff alleges that events preceding her 2007 promotion to Associate Professor were retaliatory. (Docket No. 57 at 31.) She does not dispute, however, that she ultimately was promoted, regardless of what may have occurred prior to her promotion. An "adverse employment action" includes actions such as "firing, failure to promote, reassignment with significantly different responsibilities, a material loss of benefits, suspensions, and other indices unique to a particular situation." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004). The most that the plaintiff complains of here is a minor delay in the processing of her promotion application. As she did not suffer an adverse employment action in this instance, this retaliation claim fails.

Fourth, the plaintiff alleges that she was not paid for a course taught in 2007, and that this was retaliatory. (Docket No. 57 at 31.) Although the causal connection between the plaintiff's 2004 complaints and this event is tenuous, we will assume that the plaintiff has established a *prima facie* case with respect to this claim. However, the defendant maintains that the plaintiff was in fact paid for *teaching* the course, but that she had not been paid for *developing* the course because she had not revised the course so that it could be taught again. (Docket No. 77 at 28-29.) Having provided a legitimate non-discriminatory reason for its actions, the plaintiff must establish that this reason was pretextual. As she has not offered any other details regarding this allegation or evidence to suggest that the reason was pretextual, this claim fails.

Finally, the plaintiff claims that she was subject to retaliatory harassment. (Docket No. 57 at 31-32.) However, the plaintiff provides few details about when the alleged harassing events took place. To the extent that she does provide dates, most of the incidents—for example, the defendant's failure to reimburse her for her travel, her removal as the Director of Television

21

Studies, and Von Palko's statement about the plaintiff "raising hell"—took place prior to her complaints to Jackson and the EEOC. As there is no evidence that the harassment of which the plaintiff complains took place following her complaints, let alone as a result of those complaints, the plaintiff's retaliatory harassment claim fails.

## VI. Affirmative Defense and Motion to Amend the Answer

In its motion, the defendant has asserted an affirmative defense with respect to the plaintiff's hostile work environment claim. As we have found that that claim has no merit, we decline to address the merits of the affirmative defense, the plaintiff's argument that the defense is untimely, or the defendant's Motion to Amend the Answer to assert the defense.

## CONCLUSION

The plaintiff has failed to raise a genuine issue of material fact as to whether the defendant discriminated against her on the basis of race or sex by failing to promote her, subjecting her to a hostile work environment, or retaliating against her. As such, the defendant's Motion for Summary Judgment on each of these claims will be granted, and the defendant's Motion to Amend the Answer will be denied as moot.

An appropriate order will enter.

_____

ALETA A. TRAUGER
United States District Judge

22